IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OLIVIA NORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | 14-cv-7930 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| PATRICK R. DONAHOE, | ) | |
| Postmaster General of | ) | |
| the United States, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Olivia Norman claims that her employer, the United States Postal Service (USPS), discriminated against her on the basis of sex and retaliated against her for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964. Defendant has moved for summary judgment. For the reasons given below, Defendant's motion is denied.

## Factual Background

Understanding the dispute in this case requires some basic knowledge of how USPS employees are organized and promoted. Postal employees are grouped into categories known as "crafts." Def.'s SOF ¶ 2. Two examples are the Clerk Craft and the Maintenance Craft. *Id.* Within each craft there are different positions and different pay grades, each requiring different levels of experience and aptitude. Pl.'s SOAF ¶ 3. Employees can be promoted within a craft or move from one craft to another if they satisfy the requirements of the collective bargaining agreement (CBA) between the USPS and the American Postal Workers Union (APWU).

This case concerns a Clerk Craft employee who sought to become a Maintenance Craft employee. Under the CBA, vacant Maintenance Craft positions at a facility first must be offered to Maintenance Craft employees at that facility who already hold the same position and merely seek to change shifts. *See* Pl.'s Ex. 4, Joint Contract Interpretation Manual (JCIM) at 280–81. Such employees are selected from a list called the Preferred Assignment Register (PAR). *Id.* If vacancies remain after the PAR is utilized, the positions must next be offered to Maintenance Craft employees at the facility who have qualified for promotion and are listed on the Promotion Eligibility Register (PER). *Id.* If there are still vacant positions after that, the positions are to be offered either to Maintenance Craft employees from other facilities who are seeking to transfer or to employees at the facility who have qualified to be included on an "in-service register" for the position in question. *Id.* An in-service register can include both Maintenance and non-Maintenance employees. Management is to create an in-service register when "in-craft procedures will not meet the present or future staffing needs" of the facility. Pl.'s SOAF ¶ 7. Employees are included on in-service registers based on interviews and exam scores. *Id.*

The only time an in-service register is to be utilized before offering a position to a Maintenance Craft employee who seeks transfer from another facility is if another Maintenance Craft employee is actually on the register. *See* Pl.'s Ex. 4, JCIM at 280. If the in-service register is composed of non-Maintenance employees,

2

Maintenance Craft employees seeking transfer are given priority over the employees on the register.[1] *Id.*

The method described above for filling vacant positions is suspended when a facility receives an order from headquarters to "withhold" certain vacant positions. Pl.'s SOF ¶ 31. These orders are issued if another facility in the area will be eliminating Maintenance positions, leaving employees without jobs. *Id.* During a withholding, vacant positions can be filled only by "excessed" employees from the impacted facility. *Id.* A withholding normally lasts until the excessed employees secure positions. *Id.* ¶ 32.

When the events giving rise to this case began, Norman was working at the USPS's Processing and Distribution Center in Palatine, Illinois, as a member of the Clerk Craft. Def.'s SOF ¶¶ 1–3, 7. She had been a member of that craft since becoming a postal employee in 1989. *Id.*

Near the end of 2012, management at the Palatine facility announced the creation of an in-service register for a number of positions in the Maintenance Craft. Pl.'s SOAF ¶ 2. Norman applied to be included on this register for three positions: Electronic Technician Level 10, Maintenance Mechanic Level 9, and Building Equipment Manager Level 9. *Id.* ¶ 9. She took the required exams and was

---

[1] Norman disputes that the CBA requires management to offer vacant Maintenance positions to Maintenance Craft employees seeking transfer before offering them to non-Maintenance employees on the in-service register. As explained in the Analysis section of this opinion, however, her understanding of the CBA on this point is unambiguously mistaken.

3

interviewed. Def.'s SOF ¶ 7. She was the only woman seeking inclusion on the register. *Id.* ¶ 9.

Norman was notified on February 17, 2013, that she was eligible for all three positions and that she was ranked highest among the employees who would be included on the in-service register. Pl.'s SOAF ¶ 9. Her ranking meant that she would be the first employee offered an available position in the event the register was utilized.

Also in February 2013, management at the Palatine facility posted notices of their intent to fill nineteen vacant positions in the Maintenance Craft, including six vacant Electronic Technician positions, four vacant Maintenance Mechanic positions, and six vacant Labor Custodian positions. *Id.* ¶ 9. Labor Custodian is a lower-level Maintenance position that is often used as a means of entry into that craft. Def.'s SOF ¶ 4.

By March, some of the vacant positions had been filled by current members of the Maintenance Craft, but positions still remained open in each category. Pl.'s SOAF ¶¶ 15–16. Norman, however, was not offered one of the Electronic Technician or Maintenance Mechanic positions. *Id.* ¶ 17. The Maintenance Manager of the Palatine facility, Ricky Hilliard, instead offered to make her a Labor Custodian, a position for which she had been ranked on an in-service register years earlier. *Id.* ¶ 25.

Hilliard's explanation for offering Norman the custodial position rather than one of the higher-level Maintenance positions for which she was eligible was that

4

the in-service register for the higher-level positions was not yet complete, meaning it could not be utilized at that time. Hilliard encouraged Norman to accept the custodial position and then "ask to have her scores converted" so that she could be promoted from within the Maintenance Craft. Def.'s Ex. B, Hilliard Dep. at 15. Norman declined the Labor Custodian position because she was unsure how long the score-conversion process would take, and she did not want to accept the pay cut she would face as a Labor Custodian. Pl.'s SOAF ¶ 26.

The reason the in-service register for the higher-level Maintenance positions had not yet been completed, according to Hilliard, was that another employee who had applied, David Bierman, still had not been interviewed. Pl.'s SOAF ¶¶ 19–20. According to Hilliard, the register could not be finalized until each of the candidates for that particular in-service register had been "given the opportunity to complete that process." *Id.*; Def.'s Ex. B, Hilliard Dep. at 17.

At some point, Joseph Golden, a Maintenance Craft employee who also held the position of Maintenance Craft Director in the APWU, learned that Bierman had twice failed to attend his scheduled interview. Pl.'s SOAF ¶ 20. Golden met with Hilliard and proposed that Bierman's application should be deemed abandoned and that the in-service register should be promptly completed so that Norman could be given one of the vacant positions.[2] *Id.* ¶¶ 21–23. But Hilliard continued to insist that he could not complete the register until Bierman was interviewed. *Id.* ¶ 23.

---

[2] Defendant objects to any reliance on Golden's declaration on the ground that it lacks foundation and consists of hearsay. As explained in the Analysis section, the Court for the most part disagrees.

5

Even after Golden pointed out to Hilliard that Bierman's exam results meant that he would rank below Norman on the list regardless of his interview, Hilliard remained steadfast. *Id.*

In June 2013, Bierman was finally interviewed, and the in-service register was completed. *Id.* ¶ 24. Hilliard, however, continued not to utilize it. The parties dispute why. *Id.*

Defendant contends that vacant positions were subject to a withholding order, citing the testimony of Hilliard and a manager who worked below him that there was a withholding "in 2013." *See* Def.'s SOF ¶¶ 9–11; Def.'s Ex. B, Hilliard Dep. at 19–21; Def.'s Ex. C, Spencer Dep. at 23. As explained, withheld vacancies can be filled only with "excessed" employees, meaning employees being forced out of their positions at another facility. Norman responds that neither Hilliard nor the manager testified that a withholding order was in place throughout 2013, and neither of them offered any details about precisely when such an order was in effect. Pl.'s Resp. Def.'s SOF ¶ 9.

Norman also points to evidence that any required withholding was relatively limited. That evidence includes the only two withholding notices in the record, one of which was issued in May 2013 and the other in July 2013. *See* Pl.'s SOAF ¶ 33; Pl.'s Ex. 23, Notices of Withholding. These notices required the withholding of two Electronic Technician positions and five Maintenance Mechanic positions, *id.*, and other evidence in the record shows there were additional vacancies not subject to these orders. For example, at least three Electronic Technician or Maintenance

6

Mechanic positions were filled in June and July 2014 with people who voluntarily transferred, and this would not have been possible if all vacant positions were subject to a withholding order throughout 2013. *See* Pl.'s SOAF ¶ 35. And although the record is not clear on how many vacancies remained after the voluntary transfers, vacancies definitely existed in the fall of 2013 when management posted notices of their intent to fill five vacant Electronic Technician positions and one vacant Maintenance Mechanic position. *See* Pl.'s SOAF ¶ 42; Pl.'s Ex. 22, Notices of Intent.

One employee who transferred to Palatine in June 2013, a woman named Racquel Badrina, has additional relevance to this case. Badrina had held the position of Electronic Technician Level 10 at her former facility. Pl.'s SOAF ¶ 27. Golden attests that, before Badrina arrived in Palatine, he informed Hilliard that she was an Electronic Technician Level 10. *Id.* Hilliard disagreed with him, however, and placed Badrina in a Maintenance Mechanic Level 9 position upon her arrival. *Id.* Golden recounts a conversation he had with Hilliard after Badrina arrived in which Hilliard blamed Badrina for not informing him herself of her previous position and then stated, "[Y]ou know how women are." Pl.'s SOAF ¶ 29; Pl.'s Ex. 5, Golden Decl. ¶ 28. Golden responded that he did not, and Hilliard purportedly rejoined, "[C]ome on, you know." *Id.* Golden adds that, in his nine years working at Palatine—a period during which Hilliard was at all times the facility's Maintenance Manager—no woman before Badrina had held a Maintenance position there higher than a Level 6. Pl.'s SOAF ¶ 28; Pl.'s Ex. 5 Golden Decl. ¶ 28.

7

In August 2013, although Hilliard still had not taken anyone off the in-service register, he decided to reopen it to new applicants. Pl.'s SOAF ¶ 37. Doing so, Golden attests, created the possibility that someone could score higher than Norman and displace her from her spot at the top of the register. *Id.* ¶ 41; Pl.'s Ex. 5 Golden Decl. ¶ 30. Hilliard explained in an affidavit that opening the in-service register at that time was necessary to meet future staffing needs. *See* Pl.'s Ex. 16, Hilliard EEOC Aff. at 29.

Norman was not displaced from her top spot on the register, but months went by, and still she was not offered one of the high-level Maintenance Craft positions she sought. Hilliard has attributed this, without much specificity, to a combination of withholdings and transfer requests from Maintenance employees at other facilities. *See* Pl.'s Ex. B, Hilliard Dep. at 31–32. He has also testified that he preferred to fill Maintenance positions with Maintenance employees who were already trained to do the job. *See id.* at 22.

There is no evidence in the record that any withholdings were ordered in 2014, and by June of that year, if not sooner, there was at least one vacant Electronic Technician position that no qualified Maintenance employee wanted. This state of affairs is reflected in testimony from both Golden and Hilliard that Hilliard wanted to change the work schedule of a vacant Electronic Technician position in order to entice Maintenance employees from other facilities to request a transfer to Palatine. Def.'s Ex. B, Hilliard Dep. at 35–36; Pl.'s Ex. 34, Golden Decl.

¶ 34. Golden objected to Hilliard's plan as a violation of the CBA. Pl.'s Ex. 34, Golden Decl. ¶ 34.

Because of Golden and Hilliard's disagreement on this point, a meeting was held on June 17, 2014, between Hilliard, Norman, Golden, and Plant Manager Bob Prahl. Pl.'s SOAF ¶ 50; Pl.'s Ex. 5, Golden Decl. ¶¶ 34–35. Norman and Golden explained Hilliard's plan to alter the Electronic Technician position's schedule rather than offer the position to Norman. *Id.* Prahl listened and assured Norman and Golden that they would have a response soon. *Id.* On July 8, 2014, Norman was offered and accepted the position of Electronic Technician Level 10. *Id.*

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

9

## Analysis

A.  **Preliminary Evidentiary Questions**

The parties' arguments for and against summary judgment are premised in part on certain contested evidentiary conclusions. Norman relies heavily on Joseph Golden's declaration, which Defendant contends is entirely inadmissible. Norman also relies on a particular reading of the CBA to support her assertion that Hilliard was free to offer her one of the Maintenance Craft positions she sought even when Maintenance employees were voluntarily seeking to transfer to Palatine. Defendant argues that her reading of the CBA is mistaken.

1.  **Golden's Declaration**

In response to each of the facts in Norman's Local Rule 56.1 Statement that she supports with a citation to Joseph Golden's sworn declaration, Defendant asserts that the "Golden Declaration at [paragraph] is comprised of inadmissible hearsay and is speculative, argumentative, and lacking foundation." *See, e.g.*, Def.'s Resp. Pl.'s SOAF ¶¶ 7, 11, 13. Defendant, however, develops no argument in support of this contention and cites no case law or rules of evidence. This omission would be unremarkable except that Defendant also does not develop an argument on this point in his reply brief, even though Norman relies heavily on Golden's declaration in her brief opposing summary judgment.

Arguments that are not developed or supported with appropriate authority are forfeited. *Doe by & through G.S. v. Johnson*, 52 F.3d 1448, 1457 (7th Cir. 1995)

("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."). Nevertheless, the Court will explain why certain portions of Golden's declaration are admissible, why other portions may or may not be admissible, and why others are inadmissible.

Golden's sworn declaration can be divided into three main categories of information. One category is his recollections of conversations with Ricky Hilliard concerning Norman and Badrina. *See, e.g.*, Pl.'s Ex. 5, Golden Decl. ¶¶ 26, 28, 29, 35. Another category consists of statements about the makeup of the Maintenance staff in Palatine and the number and type of vacant Maintenance positions that existed there in 2013 and 2014. *See, e.g., id.* ¶¶ 15, 31. The third category is Golden's interpretations of certain provisions of the CBA and the binding Joint Contract Interpretation Manual. *See, e.g., id.* ¶¶ 7, 10. Norman offers Golden's contract interpretations to bolster her contention that Hilliard could have placed her in one of her desired positions at any time.

Golden's account of his conversations with Hilliard are admissible because statements by Hilliard in connection with his job are not hearsay. Hilliard and other members of USPS management are Defendant's agents, and statements of a party opponent's agent, like statements of the party opponent itself, are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). Moreover, some of the statements Golden attributes to Hilliard are not hearsay because they are not being offered for the truth of the matter asserted. *See id.* at 801(c)(2) ("'Hearsay' means a statement that

11

. . . a party offers in evidence to prove the truth of the matter asserted in the statement."). For example, Hilliard's purported statement "you know how women are" obviously is not being offered for its truth.

The admissibility of Golden's data about vacancies in the Maintenance Craft is somewhat less certain. Presumably Defendant objects to the admission of this information on foundation grounds, an objection that could potentially have merit. But Defendant gives the Court no reason to doubt Golden's assertion in his declaration that the information he is providing is based on his personal knowledge. Moreover, it is perfectly plausible that his position as the APWU's Maintenance Craft Director provided him with such information. In any event, the outcome of Defendant's motion for summary judgment does not hinge on the resolution of this admissibility question, which can be resolved before trial should Defendant choose to file a motion in limine on the subject.

The third category of information—Golden's views on the meaning of the CBA—are inadmissible. The pertinent provisions are in the record, and their meaning is unambiguous. As a result, the admission of Golden's opinions on the subject would be improper. *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (courts must not resort to extrinsic evidence when interpreting unambiguous contract provisions).

### 2. Priority Under the CBA

The parties disagree over whether Hilliard was required under the CBA to offer vacant Maintenance positions to Maintenance Craft employees seeking

transfer to Palatine before offering the positions to employees on the in-service register who (like Norman) were not already members of the Maintenance Craft. Defendant contends that Hilliard was required to offer vacant positions to the former group first, while Plaintiff contends that Hilliard could choose between the two groups. If Norman is correct, then Hilliard was free to offer her a Maintenance position regardless of whether the position was being sought by a Maintenance Craft employee from another facility. But if Defendant is correct, Hilliard could only offer Norman one of the vacant positions if no qualified Maintenance employee from another facility was seeking it.

This disagreement is resolved by the Joint Contract Interpretation Manual that accompanies the CBA. This manual "outlines areas of agreement on contract application" and is binding on the APWU and the USPS. Pl.'s Ex. 4, JCIM at Bates 1025.

Under the heading "Order for Filling Vacant Maintenance Positions," the manual explains that, after vacant positions have been offered to employees on the PAR and the PER, management is to "[c]onsider Maintenance Craft employees requesting transfer *before or after* in-service procedures." *Id.* at Bates 1031–32 (emphasis added). Norman relies upon this provision to support her (and Golden's) understanding that Hilliard was free to choose between her and any Maintenance employee requesting transfer. But Norman ignores that the provision goes on to specify that "'after in-service' is only in the event a within installation Maintenance employee is on the in-service register." Pl.'s Ex. 4, JCIM at Bates 1031–32. Because

13

no Maintenance employee was on the in-service register with Norman, Hilliard was required to select any qualified Maintenance employee requesting transfer before he could offer a position to Norman. As will be seen, however, this is not fatal to Norman's claims.

**B.     Discrimination Claim**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To succeed on a sex discrimination claim under Title VII, the plaintiff must show that her employer took an adverse employment action because of her sex. *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013). A substantial delay in promoting an employee constitutes an adverse action. *See Cullom v. Brown*, 209 F.3d 1035, 1042 (7th Cir. 2000) (because "a failure to promote affects the rate of pay and the accrual of leave, denying [plaintiff] an earlier promotion was not only adverse, it was materially adverse"). Recently, the Seventh Circuit reiterated that "the sole question that matters" at the summary judgment stage of an employment discrimination case is whether a reasonable jury could find that the plaintiff would not have suffered the adverse employment action at issue if not for her membership in a protected class. *Ortiz v. Werner Enters., Inc.*, No. 15-2574, 2016 WL 4411434, at *3 (7th Cir. Aug. 19, 2016).

Although Norman's interpretation of the priority provisions of the CBA is erroneous, and although some of Golden's testimony about vacancies may turn out to be inadmissible, other evidence in the record would allow a reasonable jury to find that Norman was denied a promotion to Electronic Technician for over a year because of her sex. There is evidence that Hilliard could have offered Norman a high-level Maintenance position sooner but chose not to, including Hilliard's own testimony that he sought to make a vacant Electronic Technician position more attractive to transfers instead of offering it to Norman. Additional evidence that Hilliard wanted to avoid hiring Norman includes Hilliard's slowness in completing the in-service register, his later reopening of the register to new applicants that could have displaced Norman, and his refusal to offer Norman an Electronic Technician position until she and Golden met with the Plant Manager to complain. And Hilliard's purported comment about "how women are" is a comment that, although vague, would permit a reasonable jury to infer that Hilliard found female employees in general to be troublesome. Accordingly, Defendant's motion for summary judgment is denied as to this claim.

**C.     Retaliation Claim**

To prove a retaliation claim under Title VII, a plaintiff must show that she engaged in statutorily protected activity and, as a result, suffered a materially adverse employment action. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). Norman filed a series of complaints concerning Hilliard with the Equal Employment Opportunity Commission (EEOC) between April 2013 and July 2014,

*see* Def.'s SOF ¶14; Pl.'s SOAF ¶¶ 51–53, and filing a complaint with the EEOC is statutorily protected activity, *see* 42 U.S.C. § 2000e-3(a).

Defendant argues that Norman cannot show a causal connection between her protected activity and Hilliard's refusal to promote her. In support of this argument, Defendant makes a grievous misstatement of law, asserting that "[i]nferences and circumstantial evidence cannot be used to establish a prima facie case for retaliation." Reply Br. at 10. This idea comes from dictum in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002), that the Seventh Circuit rejected a decade ago. *See Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (explicitly rejecting *Stone* dictum). Instead, if a plaintiff who brings a retaliation claim "can prove by means of circumstantial evidence that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains, that is fine." *Id.*

Norman contends that circumstantial evidence—namely, temporal proximity—would allow a reasonable jury to infer a causal connection between her protected activity and Hillard's refusal to give her one of the Maintenance positions she sought. Resp. Br. at 13–14. Hilliard learned in June 2013 that Norman had complained to the EEOC, and Norman filed another complaint on July 18, 2013. *See* Pl.'s SOAF ¶ 54; Pl.'s Ex. 7, 2013 EEOC Compl. Hilliard then persisted in his refusal to offer her a position, and he announced one month after her July complaint that he had decided to reopen the in-service register to new applicants, a

decision that could have displaced Norman from her top spot on the register. *See* Pl.'s SOAF ¶ 37.

Temporal proximity between protected activity and an adverse action can be evidence that the action was retaliatory. *Stone*, 281 F.3d at 644. Although "mere temporal proximity . . . will rarely be sufficient in and of itself to create a triable issue," *id.*, an adverse action can come "so close on the heels of a protected act that an inference of causation is sensible," *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). "Deciding when the inference is appropriate cannot be resolved by a legal rule." *Loudermilk*, 636 F.3d at 315.

Hilliard's purported resistance to placing Norman in a high-level Maintenance position began before she engaged in protected activity, which could undermine the reasonableness of an inference that the two events are causally connected. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). But a reasonable jury could infer from Hilliard's reopening of the in-service register when he did is that Norman's ongoing EEOC activity inspired him to dig in his heels. The Court thus concludes that a reasonable jury could find that Hilliard, by continuing to deny Norman a high-level Maintenance position, retaliated against her for engaging in protected activity. Accordingly, Defendant's motion for summary judgment is denied as to this claim as well.

## <u>Conclusion</u>

For the reasons given, the Defendant's motion for summary judgment [44] is denied in its entirety. A status hearing will be held on 10/11/16 at 9:00 a.m. The

parties should be prepared at that time to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS SO ORDERED.**              ENTERED    9/26/16

_____
**John Z. Lee**
**United States District Judge**